```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
 MICHAEL ADAMS,                        :
                                       :
                        Plaintiff,     :      15cv6741(DLC)
                                       :
             -v-                       :      OPINION AND ORDER
                                       :      _____
 CITY OF NEW YORK, POLICE OFFICER      :
 CASTILLO, POLICE OFFICER DANIEL       :
 O'NEILL, SERGEANT MICHAEL VENTO, JOHN :
 DOE #1-3,                             :
                                       :
                        Defendants.    :
                                       :
-------------------------------------- X
```

APPEARANCES:

For the plaintiff:
Nicholas Mindicino
Stoll, Glickman & Bellina, LLP
475 Atlantic Avenue, 3rd Floor
Brooklyn, NY 11217

For the defendants:
Michael K. Gertzer
Zachary W. Carter
New York City Law Department
100 Church Street
New York, NY 10007

DENISE COTE, District Judge:

This case arises from the arrest of Michael Adams ("Adams")

on November 16, 2014, during his protest against the demolition

of a Harlem landmark.  Adams has sued the City of New York

("City"), Police Officers Jason Castillo ("Castillo") and Daniel

O'Neill ("O'Neill"), and Sergeant Michael Vento ("Vento") for

false arrest, malicious prosecution, and violation of his First

Amendment rights.  The plaintiff and defendants both move for summary judgment under Rule 56, Fed. R. Civ. P.  For the reasons that follow, the defendants' motion is granted.

## Background

The following facts are undisputed or taken in the light most favorable to Adams, unless otherwise noted.  Adams authored a book on the architectural history of Harlem, and has long sought to preserve historically important buildings in Harlem. On Sunday, November 16, 2014, at about 10:00 a.m., Adams went to the Renaissance Ballroom and Casino ("Renaissance"), which was located on 7th Avenue between 137th and 138th Street in Harlem, to protest its planned demolition.  Adams was the sole protester, although photographer Antwan Minter ("Minter") attended to document the protest.  The Renaissance was located next to the Abyssinian Baptist Church (the "Church"), and around one hundred and fifty tourists visiting the Church were on the sidewalk in front of the Renaissance waiting to enter the Church.  Adams wanted to conduct his demonstration before and after a Sunday service at the Church so that as many people as possible could see his protest.

Adams' protest largely consisted of him chanting "Save Harlem Now" and walking in a circle on the sidewalk.  Adams concedes that he was "speaking in a loud voice," which he describes as "declaiming," and that it was "louder than a usual

voice." He denies, however, that he was being unreasonably loud or that he was blocking pedestrian or vehicular traffic. Someone who Adams assumed to be the Deacon of the Church said "You should stop this[.] [W]hy are you doing this[?]" and other Church members asked him "Why are you yelling? Why are you screaming? Why are you here?"

At 11:19 a.m., a neighborhood resident called 911 to complain that a man was "standing on the corner yelling" outside of his apartment building and "waking up the whole building." The caller stated that "three or four residents have come out here and asked him to be quiet because, you know, this is a residential -- this is a neighborhood -- and he's out here yelling and waking up the neighborhood and we're asking him to be quiet." The caller asked the police to come and ask the man to be quiet or to move. Adams can be heard yelling in the background of the call. At times, his voice on the recording is as loud as the voices of the caller and dispatcher. The dispatcher put out a radio call of a "disorderly" in front of 145 W. 138th Street who was "standing on the corner yelling." The dispatcher gave a description of the man.

Officers Castillo and O'Neill responded to the dispatcher's call and arrived at the scene at approximately 11:28 a.m. The officers observed Adams protesting by chanting "save Harlem now," spoke with Adams, and then requested that their

supervisor, Vento, come to the scene.  After Vento arrived and observed Adams' protest, the three officers approached Adams, and according to Adams said "there had been a [noise] complaint" and asked "if I would not mind continuing my protest across the street."  Adams responded that he "understood of New York's noise ordinance that you had to be over a certain number of decibels and . . . that you could demonstrate on any public sidewalk you wanted to and that's it."  The officers responded that "there's been a complaint and if you won't go across the street we'll have to arrest you," to which Adams responded "[W]ell then, you have to arrest me because I'm not doing anything wrong."[1]

As the officers placed Adams under arrest and put him in handcuffs, Adams continued his chant at the same volume.  The officers took Adams to the police station, where two summonses were issued for disorderly conduct in violation of NYPL §§ 240.20(2) (unreasonable noise) and (4) (disturbing a lawful assembly).  Adams was released at approximately 1:00 p.m.

---

[1] Vento testified that he told Adams, "[S]ir, if you cross the street, you could demonstrate across the street in a safe manner so people can go to church."  Castillo testified that he "heard Sergeant Vento give Mr. Adams an order to stop protesting the shouting and screaming to the people going into the church and move over to the next corner."  O'Neill testified that the officers "instructed him that you can't yell like this on a corner.  You're bothering people and . . . he was instructed to go on the other side of the street to be quiet with a sign with no stick."

4

Before Adams was required to appear in court the summons were dismissed.

Immediately after Adams' arrest, Franklyn Mackey, who is affiliated with the Church, told Castillo that Adams was "shouting at people on the corner 'save Harlem now,' blocking tourists and people and church goers from lining up going to church and disturbing people from enjoying their day."  After the November 16 arrest, Adams protested the demolition of the Renaissance every Sunday until it was torn down around Easter. Adams testified that these protests followed the "same form," except that he stood across the street from the location of the November 16 protest, and while the police arrived three times during his protests, he was not arrested.

Adams brings three causes of action under 42 U.S.C. § 1983 for false arrest, malicious prosecution, and the violation of his First Amendment rights.[2]  He also brings a state law claim for false arrest and illegal imprisonment and contends that the City is liable for those claims under a theory of respondeat superior.  The original complaint was filed on August 25, 2015 and amended on June 9 to include O'Neill and Vento.  Both the plaintiff and defendants filed motions for summary judgment on

---

[2] Adams' claims for municipal liability under Monell were dismissed on March 22, 2016.  Adams v. City of New York, No. 15cv6741(DLC), 2016 WL 1169520 (S.D.N.Y. Mar. 22, 2016).

October 24, 2016.  The motions became fully submitted on
November 17.

## Discussion

Summary judgment may not be granted unless all of the
submissions taken together "show[] that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary
judgment is appropriate where the record taken as a whole could
not lead a rational trier of fact to find for the non-moving
party."  Smith v. Cty. of Suffolk, 776 F.3d 114, 121 (2d Cir.
2015) (citation omitted).  The moving party bears the burden of
demonstrating the absence of a material factual dispute.
Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 456
(1992); Gemmink v. Jay Peak Inc., 807 F.3d. 46, 48 (2d Cir.
2015).

Once the moving party has asserted facts showing that the
non-movant's claims cannot be sustained, "the party opposing
summary judgment may not merely rest on the allegations or
denials of his pleading; rather his response, by affidavits or
otherwise as provided in [Rule 56], must set forth specific
facts demonstrating that there is a genuine issue for trial."
Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation
omitted).  "[C]onclusory statements, conjecture, and
inadmissible evidence are insufficient to defeat summary

6

judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

Adams' three federal claims are brought pursuant to 42 U.S.C. § 1983 and the relevant provisions of the United States Constitution. Section 1983 provides a cause of action for damages against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." "To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law." McGugan v. Aldana-Bernier, 752 F.3d 224, 229 (2d Cir. 2014).

## I.   False Arrest and Imprisonment

The plaintiff and defendants move for summary judgment on the false arrest and imprisonment claims. A false arrest claim under either federal or New York law requires a plaintiff to prove that "(1) the defendant intended to confine the plaintiff,

(2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) <u>the confinement was not otherwise privileged</u>." <u>Liranzo v. United States</u>, 690 F.3d 78, 95 (2d Cir. 2012) (citation omitted); <u>see also</u> <u>Simpson v. City of New York</u>, 793 F.3d 259, 265 (2d Cir. 2015). "To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity." <u>Simpson</u>, 793 F.3d at 265.

"Probable cause is determined on the basis of facts known to the arresting officer at the time of the arrest." <u>Shamir v. City of New York</u>, 804 F.3d 553, 557 (2d Cir. 2015) (citation omitted). The probable cause defense to a false arrest claim requires only that there was probable cause for an arrest; it does not require that the officer had probable cause to arrest for the specific offense charged. <u>Marcavage v. City of New York</u>, 689 F.3d 98, 109-10 (2d Cir. 2012).

"[Q]ualified immunity provides a broad shield . . . to ensure that those who serve the government do so with the decisiveness and the judgment required by the public good." <u>Zalaski v. City of Hartford</u>, 723 F.3d 382, 389 (2d Cir. 2013) (citation omitted). "Qualified immunity protects public officials performing discretionary functions from personal

liability in a civil suit for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Morse v. Fusto, 804 F.3d at 546 (citation omitted).  An officer "is entitled to qualified immunity against a suit for false arrest if he can establish that he had arguable probable cause to arrest the plaintiff." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015) (citation omitted).  "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Id. (citation omitted).  Courts "look to the information possessed by the officer at the time of arrest" when determining whether an officer's conduct was objectively reasonable. Id. (citation omitted).

The defendants identify NYPL §§ 240.20(2), (4) and (5) as the statutory sections that provided probable cause for Adams' arrest.[3]  This statute provides, in relevant part:

---

[3] Defendants' motion to dismiss Adams' complaint was predicated on his violation of NYPL § 240.20(6), which makes it unlawful to "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . congregate[] with other persons in a public place and refuse[] to comply with a lawful order of the police to disperse."  The complaint had alleged that Adams was protesting on November 16 with others. After discovery revealed that the plaintiff protested alone on that day, and Adams removed the allegation that others were protesting with him, § 240.20(6) was no longer relevant.

A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . .

2. He makes unreasonable noise; . . .

4. Without lawful authority, he disturbs any lawful assembly or meeting of persons; or

5. He obstructs vehicular or pedestrian traffic[.]

Id.

The offense of disorderly conduct has three elements: "(i) the defendant's conduct must be 'public' in nature, (ii) it must be done with 'intent to cause public inconvenience, annoyance or alarm' or with recklessness as to 'a risk thereof,' and (iii) it must match at least one of the descriptions set forth in the statute." Provost v. City of Newburgh, 262 F.3d 146, 157 (2d Cir. 2001). "[E]vidence of actual or threatened public harm ('inconvenience, annoyance or alarm') is a necessary element of a valid disorderly conduct charge." People v. Johnson, 22 N.Y.3d 1162, 1164 (2014).

In determining whether the person who was arrested possessed the requisite intent courts consider "many factors, including the time and place of the episode under scrutiny; the nature and character of the conduct; the number of other people in the vicinity; whether they are drawn to the disturbance and, if so, the nature and number of those attracted; and any other relevant circumstances." People v. Baker, 20 N.Y.3d 354, 360

(2013) (citation omitted).

> An assessment of intent frequently depends on
> circumstantial evidence.  But unlike at trial, where
> circumstantial evidence must support a finding of
> culpable intent beyond a reasonable doubt, a probable
> cause determination, and thus an arguable probable
> cause determination, can be made on substantially less
> evidence.  Moreover, because the practical restraints
> on police in the field are greater with respect to
> ascertaining intent, the latitude accorded to officers
> considering the probable cause issue in the context of
> mens rea crimes must be correspondingly great.

Zalaski, 723 F.3d at 393 (citation omitted).

The officers are entitled to qualified immunity with respect to the false arrest claims because they had arguable probable cause to arrest Adams for "mak[ing] unreasonable noise" in violation of NYPL § 240.20(2).  It is undisputed that Adams' conduct was public in nature, as it was on a public street and directed at members of the public waiting in line to visit the Church.  Based on undisputed facts, the officers also had sufficient circumstantial evidence to determine that Adams either intended to cause, or recklessly created a risk of causing, public inconvenience, annoyance or alarm: The officers were aware that a complaint had been made about a man "standing on the corner yelling," could observe that Adams had chosen a location in front of a large, captive audience waiting to attend church services, heard Adams refuse to move his protest across the street, and could hear that he was using a "loud" voice and repetitive three-word chant.

11

While the parties dispute whether Adams' chant was "unreasonably" loud, the officers were not unreasonable in believing that the noise was unreasonably loud.  Their arrival at the location of the protest was prompted by a noise complaint, Adams admits he was "loud," and they had the opportunity to listen to him chant before and during his arrest. At the very least, officers of reasonable competence could disagree as to whether the volume was unreasonable.

New York law's immunity doctrine is similar to that under § 1983, and therefore the officers are also entitled to qualified immunity as to the state law claim for false arrest and illegal imprisonment.  See Jenkins v. City of New York, 478 F.3d 76, 88 (2d Cir. 2007).  Further, because the officers are entitled to qualified immunity, Adams' respondeat superior theory of liability as to the City also fails, as it is derivative of the claims against the officers.

Adams makes three arguments in opposition to the defendants' motion for summary judgment on the false arrest claim.  First, Adams argues that his voice was not "unreasonably loud."  "The term 'unreasonable noise' means a noise of a type or volume that a reasonable person, under the circumstances, would not tolerate."  Provost, 262 F.3d at 159.  Adams admits that he was chanting in a loud voice intended to communicate his protest to those attending the Church service, and it is

12

undisputed that several of those persons approached Adams to inquire why he was "yelling" and "screaming," that a neighborhood resident called 911 to complain about Adams' "yelling," and that his chanting was loud enough to be heard clearly in the 911 tape.  This is sufficient to demonstrate that there is no genuine dispute that Adams' chanting was at a volume that reasonable persons would not (and did not) tolerate in the circumstances.

Adams next argues that the defendants should not be able to rely in opposing his motion or in support of their own motion on the complaint that a Church member made to the police about the volume of Adams' chanting since the officers were not aware of the complaint at the time of the arrest, and did not speak to Mackey to record his complaint until after Adams' arrest.  The defendants have shown, however, that they had arguable probable cause to arrest Adams even without regard to this complaint.

Finally, Adams argues that he did not intend to disturb anyone, and that the officers understood that his intent was to exercise his First Amendment rights.  To violate NYPL § 240.20 a person must intend to cause or recklessly create a risk of causing public "inconvenience" or "annoyance."  There is, however, no requirement in the statute that this be a person's sole intent.  Cf. Ostrowski v. Atl. Mut. Ins. Companies, 968 F.2d 171, 180 (2d Cir. 1992) (to meet burden plaintiff must show

"animus was at least one of the 'motivating' factors in the employment decision; he or she need not show that it was the sole reason").  The fact that Adams had other motivations behind his actions does not negate that there was arguable probable cause to conclude that Adams was engaging in behavior with the intent to cause public inconvenience or annoyance, or at the very least that he acted recklessly in creating a risk of public inconvenience or annoyance.

## II.  Malicious Prosecution

The plaintiff and defendants move for summary judgment on the malicious prosecution claim brought under 18 U.S.C. § 1983. "To establish a malicious prosecution claim . . . a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions."  Stampf v. Long Island R. Co., 761 F.3d 192, 198 (2d Cir. 2014) (citation omitted).  Additionally, to maintain a § 1983 claim for malicious prosecution under the Fourth Amendment, there must be a deprivation of liberty effected "pursuant to legal process," because "the essence of malicious prosecution is the perversion of proper legal procedures."  Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 117 (2d Cir. 1995) (citation omitted); see Heck v. Humphrey, 512

14

U.S. 477, 484 (1994).  An arrest does not serve as the predicate deprivation of liberty where it occurred prior to arraignment and without a warrant, because it is not "pursuant to legal process."  Singer, 63 F.3d at 117 (citation omitted).  "[T]o be actionable under section 1983 there must be a post-arraignment seizure, the claim being grounded ultimately on the Fourth Amendment's prohibition of unreasonable seizures."  Swartz v. Insogna, 704 F.3d 105, 112 (2d Cir. 2013).

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution."  Stansbury v. Wertman, 721 F.3d 84, 94-95 (2d Cir. 2013) (citation omitted).  "The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases."  Id. at 95.  "Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty."  Id. (citation omitted).

The deprivation of liberty inherent in Adams' arrest and brief detention is akin to the tort of false arrest, addressed above, and does not rise to the level of malicious prosecution.  See Singer, 63 F.3d at 117.  The arrest was not pursuant to a warrant and therefore cannot be a deprivation of liberty "pursuant to legal process."  Further, it is undisputed that the summonses against Adams were dismissed, and that Adams was never

required to appear in court.  Thus, there was no "post-arraignment seizure" to violate Adams' constitutional rights.  Summary judgment for the defendants is granted on the malicious prosecution claim.

**III. First Amendment**

Finally, the plaintiff and defendants move for summary judgment on Adams' First Amendment claim.  Adams contends that NYPL § 240.20(2) is unconstitutional as applied to him.[4]

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  "First Amendment protections, while broad, are not absolute."  Jones v. Parmley, 465 F.3d 46, 56 (2d Cir. 2006).  "The preferred position of freedom of speech in a society that cherishes liberty for all does not require legislators to be insensible to claims by citizens to comfort and convenience.  To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself."  Kovacs v. Cooper, 336 U.S. 77, 88 (1949).

In assessing this First Amendment claim, a court should first consider whether Adams was engaged in activity protected by the First Amendment, whether the activity occurred in a traditional public forum, and if the restriction on speech was

---

[4] Adams does not assert that the defendants retaliated against him in violation of his First Amendment rights.  See, e.g., Curley v. Vill. Of Suffern, 268 F.3d 65, 73 (2d Cir. 2001).

16

unrelated to content.  <u>Marcavage</u>, 689 F.3d at 103.  If a plaintiff is

> engaged in expressive activity in a public forum and the regulation was content neutral, . . . restrictions are permissible if they [1] are justified without reference to the content of the regulated speech, [2] are narrowly tailored to serve a significant governmental interest, and [3] leave open ample alternative channels for communication of the information.

<u>Id.</u> at 104 (citation omitted).  "For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate interests."  <u>McCullen v. Coakley</u>, 134 S. Ct. 2518, 2535 (2014) (citation omitted).

> The requirement that ample alternative channels exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand; indeed, were we to interpret the requirement in this way, no alternative channels could ever be deemed ample.

<u>Mastrovincenzo v. City of New York</u>, 435 F.3d 78, 101 (2d Cir. 2006) (citation omitted).

Adams was protesting the demolition of the Renaissance on a public sidewalk.  It is undisputed that he was engaged in protected speech, and a sidewalk is a traditional public forum. <u>Marcavage</u>, 689 F.3d at 104 (2d Cir. 2012).  It is also undisputed that the restriction on speech imposed through NYPL § 240.20(2) is content neutral.  The statute prohibits a level of noise which a reasonable person could not be expected to

tolerate, without regard to the content of the speech.

For the reasons already discussed, undisputed facts establish that the statute was not unconstitutional as applied to Adams.  Those facts include the volume of Adams voice, which he admits was loud, and which was so loud that it prompted a 911 call by a neighborhood resident, complaints to Adams by those waiting to attend Church services, and Mackey's complaint.  As was true in Costello v. City of Burlington, 632 F.3d 41 (2d Cir. 2011), Adams' "noise impinged on the use of the neighborhood by others with equal claim: residents in adjacent apartments," tourists, worshippers, and Church officials.  Id. at 46.

In Costello, the police responded to a noise complaint by a store owner at a pedestrian mall.  The officer noticed that "Costello's voice stood out as a singular sound much louder than anything else."  Id. at 44.  The officer approached Costello and asked that he lower his voice.  When Costello responded that he had a "right to preach the gospel with a . . . loud voice," the officer issued him a written warning for violating the local noise control ordinance, which prohibits "unreasonable noise." Id.  In affirming the district court's grant of summary judgment in favor of the officer, the Second Circuit held that the noise ordinance as applied to Costello did not burden substantially more speech than was necessary to achieve the city's goal of curbing excessive noise, and that Costello had alternative

means, namely he could have lowered his voice.  Id. at 46.

Finally, the time, place, and manner restriction as applied to Adams was narrowly tailored to meet a substantial government interest.  The statute was applied to Adams without regard to the content of his speech, but rather, with regard to the volume.  The restriction also serves a significant governmental interest, because the "[G]overnment ha[s] a substantial interest in protecting its citizens from unwelcome noise."  Id. at 45 (citation omitted).  Adams had ample alternatives for speech, in that he could have lowered his voice or continued his protest across the street, which the defendants asked him to do.  While these might not have been perfect substitutes, reasonable alternatives need not be perfect substitutes.

In any event, the defendants are entitled to qualified immunity as to the First Amendment claim.  While Adams has a right to engage in speech in a public forum, he does not have an unlimited right to do so as loudly as he would like. NYPL § 240.20(2) is a valid and content-neutral restriction on speech.  The officers had arguable probable cause to arrest Adams for a violation of that statute and there is no evidence that they were motivated at any point by the content of Adams' chant.  Therefore, the defendants are entitled to qualified immunity.

Adams cites several cases in opposition to the defendants'

motion for summary judgment.  Adams first argues that
restrictions of speech made purely by a human voice raise
different issues than restrictions on amplified sound, citing
Kovacs v. Cooper, 336 U.S. 77, 89 (1949).  But, an unamplified
human voice may also create public inconvenience or annoyance
and may be regulated.  See Costello, l32 F.3d at 46.

Adams relies as well on Deegan v. City of Ithaca, 444 F.3d
135 (2d Cir. 2006).  In Deegan, the Second Circuit found that a
regulation restricting "unreasonable noise," interpreted to
prohibit any noise that can be heard "25 feet away," was
unconstitutional as applied to a street preacher because it
would also make illegal activities such as footsteps,
conversation, and the sounds of a child playing.  Id. at 143.  A
single store employee had complained to the police about Deegan.
Id. at 138.  In contrast, Adams' admittedly loud chanting
rousted neighborhood residents from their beds, prompted a 911
call, and prompted those waiting to attend Church services to
complain to Adams and Minter.  These facts find no parallel in
Deegan.

Adams finally argues that even if he violated the
disorderly conduct statute, his conduct is still protected by
the First Amendment, citing Edwards v. South Carolina, 372 U.S.
229 (1963).  In Edwards, African American citizens in "small
groups, walked single file or two abreast in an orderly way

20

through the [South Carolina State House] grounds, each group carrying placards" to protest against discrimination.  Id. at 231.  The Supreme Court noted that the petitioners' conduct might constitute a breach of the peace under state law, but overturned their criminal convictions.  Id. at 235.  The Court observed that the protest was an exercise of First Amendment rights "in their most pristine and classic form," and that the charged offense was so general as to be "not susceptible of exact definition."  Id. at 234-35.  It concluded that the "the Fourteenth Amendment does not permit a State to make criminal the peaceful expression of unpopular views."  Id. at 237.  Here, there is no evidence, and Adams does not contend, that any of the numerous complainants or the three officers acted in response to Adams' message as opposed to the volume at which Adams delivered the message.

## Conclusion

The defendants' October 24, 2016 motion for summary judgment is granted and the plaintiff's motion is denied.  The Clerk of Court shall enter judgment for the defendants and close the case.

Dated:    New York, New York
          December 21, 2016

                              _____
                                      DENISE COTE
                              United States District Judge